1   Marc G. Reich (SBN 159936)
    Email: mgr@reichradcliffe.com
2   Adam T. Hoover (SBN 243226)
    Email: adhoover@reichradcliffe.com
3   REICH RADCLIFFE & KUTTLER LLP
    4675 MacArthur Court, Suite 550
4   Newport Beach, CA 92660
    Phone:  (949) 975-0512
5   Facsimile: (949) 975-0514

6   Attorneys for Plaintiff
    DAVID A. BERNSTEIN
7

8               UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                   WESTERN DIVISION

11

12  DAVID A. BERNSTEIN, an individual,        Case No: 2:14-09247

            Plaintiff,
13                                            **VERIFIED SHAREHOLDER
    v.                                        DERIVATIVE COMPLAINT**
14
    CHRISTOPHER R. ANZALONE, an
15  individual;
    DOUGLAS GIVEN, an individual;             **JURY TRIAL DEMANDED**
16  MAURO FERRARI, an individual;
    EDWARD W. FRYKMAN, an individual;
17  CHARLES P. MCKENNEY, an individual;
    MICHAEL S. PERRY, an individual; and
18  BRUCE GIVEN, an individual,

19            Defendants,

20  and

21  ARROWHEAD RESEARCH
    CORPORATION, a Delaware corporation
22
            Nominal Defendant.
23

24

25

26

27

28

Plaintiff David A. Bernstein, by and through his undersigned attorneys, brings this derivative complaint (the "Complaint") for the benefit of nominal defendant, Arrowhead Research Corporation ("Arrowhead" or the "Company"), against certain members of its Board of Directors seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

## NATURE AND SUMMARY OF THE ACTION

1.   Nominal Defendant Arrowhead is an early, development-stage biotech company.  Arrowhead is a Delaware corporation headquartered in Pasadena, California, incorporated on February 13, 2001.  Arrowhead claims to be developing targeted RNAi therapeutics utilizing RNA interference mechanisms that silences disease-causing genes.  Arrowhead's lead drug candidate is ARC-520, RNAi-based therapeutics that Arrowhead claimed effectively treat chronic hepatitis B virus (HBV) infection by silencing certain disease producing genes.  By 2014, Arrowhead's business was in large part dependent upon the success of ARC-520, which it touted as a potential cure to hepatitis B.

2.   On October 8, 2013, the Company announced the completion of the Phase I study of ARC-520, which studied the drug in non-human primates such as chimpanzees, mice, and rats.  On March 24, 2014, the Company announced the commencement of the Phase IIa study on ARC-520, which studied the drug in humans by assigning hepatitis B patients randomly to either receive ARC-520, at doses of 1 mg/kg or 2mg/kg or a placebo.

3.   The effectiveness of the drug is measured in the unit of a "log," with "1 log" representing a 90% reduction of hepatitis B surface antigens ("HBsAG"), which indicate the presence of hepatitis B in the body.  In the Phase I study of ARC-520 involving a chimpanzee that was infected with hepatitis B, the Company indicated that treatment with ARC-520 caused a 0.8 log reduction in HBsAG.

4.   On August 12, 2014, in a conference call to report on Q3 2014 earnings and the progress of the Phase IIa study, CEO and Director-Defendant Christopher Anzalone

and Chief Operating Officer (and brother of Director-Defendant Douglass Given) Bruce Given falsely represented that its Phase IIa viral reduction was better than the 0.8 log viral reduction experienced by the chimpanzee in Phase I.

5.   On October 8, 2014, the Company announced the actual results of its Phase IIa study which revealed that ARC-520, dosed at 2 mg/kg, only created a 0.3 log reduction in HBsAG, much less than what the Defendants had previously suggested on August 12, 2014.

6.   On this news, the Company's stock fell $5.48 per share, which was almost a 44% from its previous closing price, and closed at $7.03 per share on October 8, 2014.

7.   As a result of defendants' false and misleading statements, the Company has been sued in two securities class actions filed in the Federal District Court in the Central District of California on October 8, 2014 and October 13, 2014.

## JURISDICTION AND VENUE

8.   This Court has jurisdiction over each of the Defendants because they conduct business in, reside in, and/or are citizens of California. Nominal Defendant Arrowhead is a citizen of California as it has its principal place of business located at 225 South Lake Avenue, Suite 1050, Pasadena, California 91101.  This Court has jurisdiction pursuant to 28 U.S.C. §1332 in that there is complete diversity between the parties and the matter in controversy exceeds $75,000.

9.   Venue is proper in this County because the acts, practices, and transactions pleaded herein occurred and were affected to a major extent within this County, Arrowhead maintains executive offices in this District, and the Director-Defendants have received substantial compensation in this District by doing business and engaging in numerous activities that had an effect in this District.

## THE PARTIES

10. Plaintiff David A. Bernstein is and has been continuously throughout all relevant times the owner of Arrowhead shares during the Relevant Time Period.  He is a resident of Kent, Michigan.

11. Nominal Defendant Arrowhead, a Delaware corporation headquartered in Pasadena, California incorporated on February 13, 2001, is a biopharmaceutical company attempting to develop medications to treat hepatitis B virus ("HBV") through RNAi therapeutics and RNA interference mechanisms that silences disease-causing genes.  Arrowhead's leading drug candidate is ARC-520, an RNAi-based therapeutic designed to treat chronic hepatitis B virus (HBV) infection.

12. Defendant Christopher Anzalone ("Anzalone") is and has been the Company's President, Chief Executive Officer, and a member of the Company's Board of Directors ("Board") since December 1, 2007.  Upon information and belief defendant Anzalone is a resident of California.

13. Defendant Douglass Given ("D. Given") is and has been a member of the Board since November 2010.  Upon information and belief defendant D. Given is a resident of California.

14. Defendant Mauro Ferrari ("Ferrari") is and has been a member of the Board since 2010.  Upon information and belief defendant Ferrari is a resident of Texas.

15. Defendant Edward Frykman ("Frykman") is and has been a member of the Board since January 2004.  Upon information and belief defendant Frykman is a resident of California.

16. Defendant Charles McKenney ("McKenney") is and has been a member of the Board since April 2004.  Upon information and belief defendant McKenney is a resident of California.

17. Defendant Michael Perry ("Perry") is and has been a member of the Board since December 2011.  Upon information and belief defendant Perry is a resident of Colorado.

18. Defendant Bruce Given ("B. Given") is and has been Chief Operating Officer and Head of Research and Development of the Company since 2010.  Upon information and belief defendant Given is a resident of California.

19. Defendants Anzalone, D. Given, Ferrari, Frykman, McKenney, and Perry are collectively referred to hereinafter as the "Director-Defendants."

20. Defendants Anzalone, B. Given, D. Given, Ferrari, Frykman, McKenney, and Perry are collectively referred to hereinafter as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

21. On August 12, 2014, Defendants caused the Company to file with the SEC a Form 8-K that announced and commented on its fiscal 2014 third quarter financial results for the period ended June 30, 2014.  The Company issued a press release on August 12, 2014, regarding ARC-520 response to human hepatitis B patients, which stated in relevant parts:

a. Completed dosing of 1 mg/kg and 2 mg/kg dose cohorts.

b. Initial blinded data suggest that the magnitude of HBsAg knockdown is similar to non-human primate studies, including the chronically infected chimpanzee reported on previously.

c. Duration of knockdown appears to be substantially more sustained than in non-human primates, with patients in the 2 mg/kg group still demonstrating substantial knockdown after 8 weeks, which is the most recent time point available.

d. HBsAg levels appear to continue to decline in a number of patients at the 8 week time point in the 2 mg/kg group.

e. Based on initial review, dosing less frequent than once monthly will be explored in Phase 2b.

f. ARC-520 continues to be well tolerated, with no dropouts or serious adverse events reported.

g. The overall rate of AEs has been lower in the Phase 2a than in the Phase 1 normal volunteer study and safety labs continue to show no indication of end organ toxicity.

h. Enrolled and dosed additional subjects at 3 mg/kg in the still open normal volunteer study and the dose performed well, without detected differences from safety and tolerability results at the other doses. Overall AEs do not appear to be increasing in frequency or severity with dose.

i. Received IRB and DSMB approvals to proceed and began enrolling an additional dose cohort at 3 mg/kg in the Phase 2a patient study.

22. On the same day, August 12, 2014, Defendant Anzalone stated the following during a conference call:

> The fiscal third quarter in recent period have been exciting and productive times for Arrowhead. We continue to push forward rapidly with our product developments and pipeline expansion goals, and now have two drug candidates in or approaching the clinic and a handful of other undisclosed program that are progressing nicely.

> Let's begin with our lead candidate ARC-520 for the treatment of chronic hepatitis B infection. I'll provide some highlights and later in the call Bruce will provide more detailed information.

> As you know, earlier this year we initiated a dose finding Phase 2a study designed to inform a multi-dose Phase 2b study. Our two primary goals were to identify a dose that, A, induces a 90% reduction of circulating s-antigen after a single administration and B, provides durable enough knockdown to enable once per month dosing. Given our studies in multiple animal models, we were quite confident that we could achieve this, but just did not know what that dose would be in humans.

> Our interim results have been extremely exciting. We completed dosing of 1 and 2 milligrams per kilogram in June and those studies still blinded, several important conclusions may already be drawn. We are seeing clear knockdown in both groups and duration of that knockdown has been substantially longer than we expected.

> We currently have data from the 2 milligrams per kilogram cohort as far out as two months after dosing and in these patients we perceive -- and in the patients we perceive as having received ARC-520, we still see substantial knockdown at this time point.

23. On the same August 12, 2014 conference call, the Company's Chief Operating Officer and Head of Research and Development, Defendant B. Given made the following positive remarks about the Company's ARC-520 results:

> We have surface antigen data for all patients into 2 mg per kg dose group through six weeks and for five of eight patient's we have data through eight weeks.

> Again with the caveat that the data is still blinded we believe the knockdown is clearly deeper in this group versus 1 mg per kg and at eight weeks the patients we perceive is having received active drug so surprisingly large reductions in surface antigen.

Overall, duration of knockdown appears to be substantially more sustained in humans compared to the non-human primates we have studied at the same doses. For the depth of knockdown appears to be similar in magnitude with what we see in non-human primates of same doses, including the HBV infected chimpanzee presented at AASLD last year. We think that we are right around the middle of the ascending part of dose response curve at the 2 mg per kg dose.

When the surface antigen data started to emerge we saw the potential to expand the dose finding study and explore dose at higher than 2 mgs per kg in patient. In preparation for that, we enrolled a 3 mg per kg cohort and are still open normal volunteer study. This dose also performed well without detected differences from safety and tolerability results at other doses.

Overall AEs do not appear to be increasing in frequency or severity with dose. With this safety data in hand, as well as from the Hong Kong patient, we amended the Hong Kong study to include a new 3 mg per kg cohort. This amendment has been approved by both Hong Kong site IRBs and the study DSMB also recommended going forward. This cohort is now dosing.
***So how should we think about these results? The dose range for knockdown in humans appears to be similar to that seen in non-human primates, including the previously reported HBV infected chimpanzee.***

24. On the same August 12, 2014 conference call, following a financial overview from Chief Financial Officer Myszkowski, Company President Defendant Anzalone made the following remarks regarding the positive outlook for ARC-520 and the Company:

We've begun a very exciting phase, characterized by the transition from a science-based company that is full of promise to a drug company providing real benefits to patients. Until now, we had demonstrated exciting data in animal models, some of the most dramatic in the field and a good safety profile in healthy human volunteers. We are now taking the next leap forward with ARC-520 by expanding emerging positive safety profile in more patients at higher dose and generating knockdown data in patients.

We have seen unexpectedly durable knockdown in humans, reinforcing our belief that DPC is our best-in-class delivery for RNAi and suggesting that ARC-520 may ultimately be dosed less frequently than monthly. We're also seen depth of knockdown that is similar to that verdict in animal models to suggest that primates or indeed mice are good models predicting dose and effective in patients for our technology. It is the clinical insight that we expected but can only confirm by observing knockdown directly in human subjects. This allows us to move forward with our entire R&D program with greater confidence and speed.

Our newly disclosed, ARC-AAT program continues to move forward as expected and ARC-520 human data validate and de-risk it. We have executed on our goals during the quarter, and are committed to continuing that in the periods ahead. Some of our upcoming goals include the following, we'll present additional clinical data on Phase 2a study of ARC-520 around AASLD this year and additional non-clinical data on ARC-AAT at press release and a key scientific medical meetings in the fourth quarter.

25. Following these remarks from Company President Defendant Anzalone, the conference call was opened up for questions.  Michael Yee representing RBC Capital Markets had the following exchange with Defendant Anzalone:

Michael Lee- RBC Capital Markets:
Yeah. Hi. Good afternoon. Thanks guys. A couple of questions, first on your ongoing Phase 2a study. You should have qualified 1 mg and 2 mg curves, people are implying that 2 mgs is around 0.8 log reduction like the animal study. But what is your confidence that 3mgs is going to be greater than 0.8. Are you just comparing that to the current time point and the drop you've seen in the time point in the 2 mgs. How confident are you that, that will be greater than a 1 mg -- excuse me, 1 log?
And then going forward, since we're trying to ultimately get functional here in the Phase 2b study, how confident are you in a functional cure if you're not above 1 log. And how many doses will you get and what time points are you looking at your -- to actually look at the functional cure?

Dr. Christopher Anzalone - President and CEO
Sure, I'll take a crack and I'll hand it over to Bruce as well. Regarding our confidence level in achieving the log knockdown with 3 mgs/kg, we feel pretty good about that. What we saw in one 2 mgs/kg is that the depths of knockdown seems to track reasonably well with non-human primate models. But of course the durability of the fact is, it's substantially longer. And so that that gives us -- that gives us good confidence that 3 mgs/kg will give us good deep knockdown.

26. Defendant Anzalone had the following exchange with Alethia Young, who was representing Deutsche Bank:

Alethia Young - Deutsche Bank
Great, thanks for taking my question, and congrats on the progress. I just wanted to ask about the 1 log theory again. Do you still stand by the 1 log knockdown, if you're seeing a longer duration of response? And then the second question is, run us through like why you believe 1 log is irrelevant (indiscernible) time point period right now, when you're basically at maybe 0.8, 0.7 right now and then I have one quick follow-up.

Dr. Christopher Anzalone - President and CEO
Sure. It's good question. Thanks very much Alethia. We think that that is an aggressive bogie and it is not clear to what we actually need to reach that level of knockdown. Having said that we think that we can certainly get there so we're more comfortable if we have it. The reason that we have, we have stuck to that bogie, is that the only thing that gives any kind of (indiscernible) semi reliable functional cures is interferon. After a year of interferon, about 10% of patients will reach a functional cure and all those patients who do get to that functional cure will see about half a log reduction in s-antigen in around 12 weeks and around one log after 24 weeks.

27. These above statements were false and or misleading when made because Defendants misrepresented the actual early indications of the phase IIa clinical study of ARC-520 and anyway understood that no scientifically meaningful projections of the ultimate result can be made so early into a clinical trial.

28. On the same day as the August 12, 2014 conference call, *Street.com* issued an article, titled, "Arrowhead Discloses First Human Hepatitis B Therapy Results." The article in pertinent part stated the following:

Arrowhead Research (ARWR) just released interim results from a mid-stage study of its experimental RNA interference therapy for hepatitis B. The announcement is short on specific details but the Arrowhead drug, ARC-520, appears to have passed through its first clinical hurdle in hepatitis B patients relatively well. Arrowhead shares closed Tuesday at $13 ahead of the ARC-520 data announcement. The stock is down 5% to $12.25 in the after-market session, reflecting some uncertainty about the results, perhaps confusion or frustration over why the company chose not to be more forthcoming with actual numbers. I wrote a preview of the ARC-520 data recently. Here's how Arrowhead describes the ARC-520 results today:

Initial blinded data suggest that the magnitude of HBsAg knockdown is similar to non-human primate studies, including the chronically infected chimpanzee reported on previously. Duration of knockdown appears to be substantially more sustained than in non-human primates, with patients in the 2 mg/kg group still demonstrating substantial knockdown after 8 weeks, which is the most recent time point available.

HBsAg levels appear to continue to decline in a number of patients at the 8 week time point in the 2 mg/kg group.

First thing you should notice is the lack of specific numbers. Arrowhead executives, on a conference call, said the study is still blinded. If the study is blinded, how can Arrowhead report results differentiated between patients dosed with ARC-520 and those on a placebo? Arrowhead says educated guesses are being made based on the blinded responses. Yes, it's a bit unusual, even weird, although I assume Arrowhead assumes hepatitis B patients treated with a placebo would show little or no response at all, making it easy to identify responses to the drug.

In a previous study of ARC-520 involving a chimp infected with hepatitis B, treatment with ARC-520 caused a 0.8 log reduction in HBsAG, which is a measure of the presence of hepatitis B virus in the body. Arrowhead says ARC-520 response in human hepatitis B patients was "similar" to the chimp results but the duration of the knockdown was longer.

In terms of Wall Street expectations, a lot of investors were looking for a 1.0 log reduction in HBsAG from this ARC-520 study, although the company and sell-side analysts were framing a win with a 0.5 to 1.0 log reduction. If ARC-520 accomplished an 0.8 log reduction, as today's announcement suggests, it will likely be viewed positively. HBsAG levels continue to decline during the study and Arrowhead says the drug appears safe enough to dose another cohort of hepatitis B patients with a higher 3 mg dose of ARC-520. On its call, Arrowhead expressed confidence in achieving a 1 log reduction in HBsAG with the 3 mg dose.

## THE TRUTH EMERGES

29. On October 8, 2014, the Company issued a press release describing the success of ARC-520. The Company stated that there was a 39% reduction of the hepatitis B's HBsAG when a 1 mg/kg dose was administered and a 51% reduction of HBsAG when a 2 mg/kg dose was administered. The stated 51% of HBsAG for the 2

mg/kg does of ARC-520 equates to only a 0.3-log reduction.  This result is significantly less than the 1-log reduction that the Defendants had previously represented to the public.  Specifically, the press release in pertinent part stated the following:

Arrowhead Research Corporation (NASDAQ: ARWR), a biopharmaceutical company developing targeted RNAi therapeutics, today announced that data from the ongoing Phase 2a study of ARC-520, its RNAi therapeutic candidate for the treatment of chronic hepatitis B (HBV) infection, will be presented in the late-breaking poster session at the 2014 American Association for the Study of Liver Diseases (AASLD) Liver Meeting being held on November 7-11, 2014, in Boston. Arrowhead was also selected to deliver a plenary presentation with new preclinical efficacy data on ARC-AAT, its RNAi therapeutic candidate for the treatment of liver disease associated with Alpha-1 antitrypsin deficiency. Additional details including abstracts for both presentations can be found in The Liver Meeting section of the AASLD website at: http://www.aasld.org/livermeeting/Pages/default.aspx.

ARC-520 represents a novel approach for the treatment of HBV with the potential to achieve functional cures," said Christopher Anzalone, Ph.D., Arrowhead's President and Chief Executive Officer. "Our ongoing Phase 2a dose finding study is an important step, and in cohort 1 at a dose of 1 mg/mg and cohort 2 at 2 mg/kg we saw a clear reduction in HBsAg, the surface antigen of HBV. Data collection for HBsAg reduction in cohort 3 at 3 mg/kg is still ongoing, however we are pleased to report that all three dose levels have been well tolerated in patients. These results give us great confidence as we move forward with designing and initiating several upcoming Phase 2b studies of ARC-520 and the ARC-AAT Phase 1 study.

30. On the same day, *TheStreet.com* published an article entitled "Arrowhead Research Sinks on Disappointing Hepatitis B Drug Data," which detailed the lower than anticipated results.  The article stated:

Arrowhead Research (ARWR) shares were sliding hard on disappointing data from its experimental hepatitis B therapy ARC-520, released at 10 a.m. EST.

In an ongoing phase II study, ARC-520 dosed at 2 mg/kg induced a 0.3 log reduction in HBsAG, which is a measure of the presence of hepatitis B virus in the body. The observed treatment effect for ARC-520 at this dose is much lower than investors expected. When Arrowhead first announced results from this study in August, the company didn't provide specific numbers but hinted that the viral reduction was closer to (but not quite) 1 log. A 0.3-log reduction is nowhere close to 1-log reduction, which explains why Arrowhead stock is selling off.

Arrowhead shares were down 30% to $8.80.

The specific data on ARC-520 disclosed this morning was contained in a late-breaker abstract for the American Association for the Study of Liver Disease (AASLD) annual meeting, which is being held in November.  The phase II study of ARC-520 in hepatitis B patients is ongoing and Arrowhead is exploring higher doses of the drug, hoping to see a more robust effect. But results from higher doses of ARC-520 have not yet been announced.  Here is the nut graph from the ARC-520 AASLD late-breaker abstract which caused Arrowhead shares to sink:

ARC-520 activity is assessed by measuring percent change of quantitative HBsAg decline from baseline. For patients receiving ARC-520 in cohort 1, mean nadir HBsAg was -39% (range -22 to -57) with a mean change on day 85 of -31% (range -14 to -39). For patients receiving ARC-520 in cohort 2, mean nadir HBsAg was - 51% (range -46 to -59) with a mean change on day 85 of -22% (range -7 to 40). For cohort 2, the percent reduction in HBsAg was statistically significant vs placebo for Days 3 through 43 post dose. This is the first time that a reduction in HBsAg mediated through RNA interference has been shown in chronic HBV patients.

***There is a formula to convert percent change in quantitative HBsAg decline from baseline into a log reduction. The 51% reduction disclosed in the abstract for the 2 mg/kg dose of ARC-520 equates to a 0.3-log reduction.***

31. Additionally, on this same day, *Streetwriter.com* published another article titled "Blame Arrowhead Management Entirely for Today's Epic Collapse," detailing the disappointing results of ARC-520.  The article stated in pertinent part as follows:

Lay all the blame for Arrowhead Research's (ARWR)  spectacular hepatitis B implosion today at the feet of CEO Chris Anzalone and the rest of the company's management team.

All CEOs of publicly traded companies must manage investor expectations. For CEOs of early, development-stage biotech companies like Arrowhead, making sure Wall Street isn't delivered a nasty surprise is absolutely crucial. Credibility lost is very difficult to retrieve. Yet for some inexplicable reason, Anzalone totally botched the job.

For months, Anzalone and his team knew ARC-520 dosed at 1 mg/kg and 2 mg/kg yielded 0.2-log and 0.3-log reductions in hepatitis B viral load. Publicly and privately, however, Arrowhead executives led investors to believe that ARC-520 was more potent, achieving viral load reductions in the range of 0.7 log or higher.

Arrowhead could have been honest with investors about ARC-520's mediocre performance at the two lowest doses. The company could have told investors, "We're not where we want to be with ARC-520 dosing and viral load reductions yet, but we think we can get there soon at higher doses and here's why."

If Arrowhead had played fair and conservatively earlier this year, perhaps the stock price might not have reached $26 in March like it did. Maybe the company's valuation bump would have been more modest. But I'm also more certain Arrowhead wouldn't trade at a year low like it is now because investors were misled and are now pissed off.

I asked Arrowhead management to explain their actions but received no response.

One more thought on this subject. I wrote the following in August after Arrowhead first announced top-line results from the ARC-520 study:

First thing you should notice is the lack of specific numbers. Arrowhead executives, on a conference call, said the study is still blinded. If the study is blinded, how can Arrowhead report results differentiated between patients dosed with ARC-520 and those on a placebo? Arrowhead says educated guesses are being made based on the blinded responses. Yes, it's a bit

> unusual, even weird, although I assume Arrowhead assumes hepatitis B patients treated with a placebo would show little or no response at all, making it easy to identify responses to the drug.
>
> Knowing what we know now, is it possible the educated guesses Arrowhead made about the blinded patient data were wrong? This in no way excuses Arrowhead's incompetence because between that August day and today, the company did eventually get the unblinded data and could have then given investors a more truthful picture of ARC-520's activity. But for investors, the Arrowhead blow up is a reminder to be very wary of any company making assumptions about clinical trial results based on blinded data.

32. Upon this news, the Company's stock fell $5.48 per share, or almost 44% from its previous closing price, and closed at $7.03 per share.

33. The Director-Defendants breached their fiduciary duties by misrepresenting the phase IIa clinical study.  Once the Director-Defendants' breach of fiduciary duty were disclosed to the market, Arrowhead's stock price reacted negatively as the artificial inflation was removed from it.

34. In connection with the above detailed misrepresentations and failures to disclose material facts, class action securities lawsuits were filed against the Company in the United States District Court, Central District of California.  The Complaints allege (among other things) that the Company and certain officers of the Company made false and misleading statements in violation of the federal securities laws.

## DAMAGES TO THE COMPANY

35. Arrowhead has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct. As a direct and proximate result of the Individual Defendants' conduct, Arrowhead has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a.  costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

b.  substantial loss of market capital;

c.  costs already incurred defending against the pending securities class actions, and potential liability therefrom; and

d.  Arrowhead's business, goodwill, and reputation with its business partners,
regulators, and shareholders have been gravely impaired.

36. The actions complained of herein have irreparably damaged Arrowhead's
corporate image and goodwill. For at least the foreseeable future, Arrowhead will suffer
from what is known as the "liar's discount," a term applied to the stocks of companies
who have been implicated in illegal behavior and have misled the investing public, such
that Arrowhead ability to raise equity capital or debt on favorable terms in the future is
now impaired.

## DEFENDANTS' DUTIES

37. By reason of their positions as officers, directors, and/or fiduciaries of
Arrowhead and because of their ability to control the business and corporate affairs of
Arrowhead, the Individual Defendants owed Arrowhead and its shareholders fiduciary
obligations of good faith, loyalty, and candor, and care and were and are required to use
their utmost ability to control and manage Arrowhead in a fair, just, honest, and
equitable manner. The Individual Defendants were and are required to act in
furtherance of the best interests of Arrowhead and its shareholders so as to benefit all
shareholders equally and not in furtherance of their personal interest or benefit. Each
director and officer of the Company owes to Arrowhead and its shareholders the
fiduciary duty to exercise good faith, loyalty, diligence, and care in the administration
of the affairs of the Company and in the use and preservation of its property and assets,
and the highest obligations of fair dealing.

38. The Individual Defendants, because of their positions of control and authority
as directors and/or officers of Arrowhead, were able to and did, directly and/or
indirectly, exercise control over the wrongful acts complained of herein, as well as the
contents of the various public statements issued by the Company. Because of their
advisory, executive, managerial, and directorial positions with Arrowhead, each of the
Individual Defendants had knowledge of material non-public information regarding the
Company.

39. To discharge their duties, the officers and directors of Arrowhead were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Arrowhead were required to, among other things:

   a.  Exercise good faith, loyalty, and care to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b.  Exercise good faith, loyalty, and care to ensure that the Company was operated in a prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

   c.  Exercise good faith, loyalty, and care to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

   d.  When put on notice of problems with the Company's business practices and operations, exercise good faith and loyalty in taking appropriate action to correct the misconduct and prevent its recurrence.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

40. A pre-suit demand on the Arrowhead Board is futile, and therefore, excused because the majority of the directors are not impartial to consider the demand for the reasons detailed below.

41. The Board of Arrowhead consist of the following six individuals: Defendants Christopher R. Anzalone, Ph.D., Douglass Given, Ph.D., Michael S. Perry, Ph.D., Mauro Ferrari, Edward W. Frykman, and, Charles P. McKenney.

42. Defendant Dr. Anzalone is and has been a Director of Arrowhead since 2007. Defendant Dr. Anzalone is and has been since 2007 the President and CEO of Arrowhead for which Defendant Dr. Anzalone received total compensation of

$1,043.201 in 2013.[1]  The Company does not claim Dr. Anzalone is an independent director.  Because Defendant Dr. Anzalone derives significant income from, and his primary source of income is, his employment as President and CEO of Arrowhead and his professional reputation is inextricably bound to his role at Arrowhead, Defendant Anzalone is incapable of acting independently and demand would be futile upon him.

43. Defendant Dr. Anzalone holds a Ph.D. in Biology from UCLA and has extensive experience in biotechnology, nanotechnology, company-building and venture capital, having been: (1) CEO of the Benet Group LLC, a private equity firm focused on creating and building new nano-biotechnology companies from university-generated science; (2) founding CEO of  Nanotope Inc., a tissue regeneration company; (3) founding CEO of Leonardo Biosystems Inc., a cancer drug delivery company; (4) partner at private equity firm Galway Partners, LLC, in charge of sourcing, structuring, and building new biopharmaceutical business ventures from 1999 until 2003; (5) founding CEO of NanoInk, Inc., a leading nanolithography company.  The Company's DEF 14A filed on December 20, 2013 stated on pg. 3 stated, "Dr. Anzalone has extensive experience in biotechnology, nanotechnology, company-building and venture capital."

Defendant Dr. Anzalone is highly educated and experienced in the science and business of preclinical and clinical drug development in the biopharmaceutical industry.  As such, Defendant Dr. Anzalone is an expert possessing advanced understanding and familiarity with the process of clinical studies and clinical study result reporting that is the core of development-stage biotech investments, such as Arrowhead.

44. Defendant Dr. Douglass Given has been a Director of Arrowhead since 2010; he is the brother of Dr. Bruce Given, the Company's COO and Head of Research and Development during the Relevant Time Period.

---

[1] Dr. Anzalone is also a director of Arrowhead's wholly-owned subsidiary, Arrowhead Madison Inc., and majority-owned subsidiaries, Calando Pharmaceuticals, Inc., Ablaris Therapeutics, Inc., and Tego Biosciences Corporation.

45. Dr. Bruce Given is one of the two Executive Officers of Arrowhead (the second is Defendant Dr. Anzalone) who are named as Defendants and directly implicated in the class actions filed in the U.S. District Court of the Central District of California on October 10, 2014 and October 13, 2014, as a result of having been one of the two speakers on behalf of the Company (along with Defendant Dr. Anzalone) in the August 12, 2014 conference in which many of the most glaring misrepresentations were made.

46. Because Defendant Dr. Bruce Given is the brother of Defendant Dr. D. Given, Defendant D. Given will not act against his brother in suing him for his above described false and misleading statements.  Defendant D. Given is not impartial in this matter and would not endanger his brother's primary source of income as the Company's COO and Head of Research and Development by either suing his brother or suing Defendant Dr. Anzalone, his brother's employer; accordingly, Defendant D. Given is incapable of acting independently and demand would be futile upon him.

47. Defendant Dr. D. Given is highly educated and experienced in the science and business of preclinical and clinical drug development in the biopharmaceutical industry.  As such, Defendant Dr. D. Given is an expert possessing advanced understanding and familiarity with the process of clinical studying and clinical study result reporting that is the core of development-stage biotech investments, such as Arrowhead.

Defendant Dr. D. Given is Chairman of Vivaldi Biosciences, a privately-held, venture-backed biotech company, and has been (1) Chief Executive Officer and a director of NeoRx, (2) Corporate Sr. Vice President and Chief Technical Officer of Mallinckrodt, (3) Chief Executive Officer and a director of Progenitor and Mercator Genetics, (4) Vice President at Schering Plough Research Institute, (5) Vice President at Monsanto/G.D. Searle Research Laboratories, and, (6) Medical Advisor at Lilly Research Laboratories.

COMPLAINT

Dr. D. Given chaired the Visiting Committee to the Division of Biological Sciences and the Pritzker School of Medicine at the University of Chicago from 2007-2013 and remains a lifetime member and Distinguished Alumni Awardee.  He is a member of the Johns Hopkins Bloomberg School of Public Health Advisory Board, a member of the Harvard School of Public Health and the Advisory Board for the Stevens Institute at USC.  Dr. D. Given holds an M.D. with honors and a Ph.D from the University of Chicago, and an MBA from the Wharton School, University of Pennsylvania. He was a fellow in Internal Medicine and Infectious Diseases at Harvard Medical School and Massachusetts General Hospital.  The Company's DEF 14A filed on December 20, 2013 stated on pg. 4 stated, "We believe Dr. Given's qualifications to serve on the Board include his extensive experience in finance and business transactions, particularly investments in the life sciences industry as well as directorship roles in start-up biotechnology companies.  Dr. D. Given also has significant leadership roles, including CEO and Senior Vice President, at several large pharmaceutical companies."

48. Defendant Dr. Michael S. Perry, Ph.D. has been a director and member of the Audit, Compensation and Nomination Committees since 2011.  Dr. Perry holds a Ph.D. in Biomedical Pharmacology and a B.Sc. in Physics and is also a graduate of the International Management Program at Harvard Business School.  Defendant Dr. Perry is not only extremely well educated in, but highly experienced in, the science and business of preclinical and clinical drug development in the biopharmaceutical industry. As such, Defendant Dr. Perry is an expert possessing advanced understanding and familiarity with the process of clinical studying and clinical study result reporting that is the core of development-stage biotech investments, such as Arrowhead.  Defendant Dr. Perry is the Global Head, Stem Cell Therapy at Novartis Pharma and prior to that was: (1) President and Chief Medical Officer of Poniard Pharmaceuticals from 2010 to November 2012; (2) Chief Development Officer at VIA Pharmaceuticals, Inc. from April 2005 until May 2009; (3) Chairman and Chief Executive Officer of Extropy

Pharmaceuticals, Inc., from June 2003 to April 2005; (4) President and Chief Executive Officer of Pharsight Corporation from 2002 to 2003; (5) Global Head of Research and Development for Baxter BioScience from 2000 to 2002; (6) President and Chief Executive Officer of both SyStemix Inc. and Genetic Therapy Inc., two wholly owned subsidiaries of Novartis Corp., from 1997 to 2000; (7) Vice President of Regulatory Affairs for Novartis Pharma (previously Sandoz Pharmaceuticals) from 1994 to 1997; and, (8) held various management positions with Syntex Corporation, Schering-Plough Corporation and BioResearch Laboratories, Inc. prior to 1994.  Defendant Dr. Perry currently serves as a member of the board of directors of biopharmaceutical companies AmpliPhi Biosciences Corporation (APHB.PK) and Avita Medical (ASX:AVH and OTCQX:AVMXY).  The Company's DEF 14A filed on December 20, 2013 stated on pg. 5, "We believe Dr. Perry's qualifications to serve on the board include his medical expertise and his extensive experience in preclinical and clinical drug development, including executive level leadership roles in several publicly held biotech companies."

49. Defendant McKenney is and has been a member of the Board since April 2004.Mr. McKenney is a director of Arrowhead's majority-owned subsidiaries Calando Pharmaceuticals, Inc., Ablaris Therapeutics, Inc., and Tego Biosciences Corporation. We believe Mr. McKenney's qualifications to serve on the Board include his long tenure as a member of the Board resulting in a deep understanding of the Company's operations, strategy and finances. Mr. McKenney also has extensive experience providing strategic legal and advisory services to developmental stage organizations.

50. Defendant Dr. Mauro Ferrari is and has been a member of the Board since 2010. Dr. Ferrari is the President and CEO of The Methodist Hospital Research Institute (TMHRI).  He is also the President of The Alliance for NanoHealth.  Dr. Ferrari is a director of, Leonardo Biosystems, Inc., in which Arrowhead holds a minority equity interest.  Dr. Ferrari is an internationally recognized expert in nanomedicine and biomedical nanotechnology.  Prior to assuming leadership of TMHRI, Dr. Ferrari was Professor and Chairman of The Department of NanoMedicine

and Biomedical Engineering at The University of Texas Health Science Center at Houston, Professor of Experimental Therapeutics at the MD Anderson Cancer Center, Adjunct Professor of Bioengineering at Rice University, and Adjoint Professor of Biomedical Engineering at the University of Texas in Austin. His previous academic appointments include professorships at UC Berkeley and Ohio State University.  From 2003 to 2005, he served as Special Expert on Nanotechnology and Eminent Scholar at The National Cancer Institute, where he led in the development of NCI's program in Nanotechnology, which remains the largest program in NanoMedicine in the world. Dr. Ferrari has been serving as the Editor-in-Chief for "Biomedical Microdevices: BioMEMS and Biomedical Nanotechnology" since 1997. We believe Dr. Ferrari's qualifications to serve on the Board include his extensive training and experience in the fields of nanotechnology, biotechnology and biomedical applications.  Dr. Ferrari has significant technical training, several academic appointments and numerous published articles and patents. Additionally, Dr. Ferrari has extensive experience in developmental stage organizations having founded several startup companies.

51. Defendant Edward W. Frykman is and has been a director of the Company since January 2004.  Frykman is a director of Arrowhead's majority-owned subsidiaries Calando Pharmaceuticals, Inc., Ablaris Therapeutics, Inc., and Tego Biosciences Corporation. The Company represents that "[w]e believe Mr. Frykman's qualifications to serve on the Board include his long tenure as a member of the Board which enabled Mr. Frykman to gain a deep understanding of the company's operations, strategy and finances. Mr. Frykman also has extensive experience in the fields of finance and public company oversight."

52. Defendant Drs. Anzalone, D. Given Perry, McKenney, and Ferrari are highly experienced biopharmaceutical experts and medical professionals and experts who had access to, reviewed and fully understood clinical study result information regarding the Phase 2a study human testing of humans ARC-520.  Given that ARC-520 was the primary clinical candidate upon which the future prospects and present value of

Arrowhead was by in large dependent upon, Defendants understood that comments regarding the results being achieved in a clinical study that was in progress would have a profound impact upon the value of the Company's stock.

53. Defendant Drs. Anzalone, D. Given Perry, McKenney, and Ferrari fully understood that as of August 12, 2014 there was no legitimate basis for the Company CEO Defendant Anzalone, and the Company COO Defendant Bruce Given, to represent that the results of ARC-520 study in the human clinical trial of Phase 2a had produced similar results to those achieved in the study of the effects of ARC-520 upon a single chimpanzee.

54. Further, Defendant Drs. Anzalone, D. Given Perry McKenney, and Ferrari knew that the CEO and the COO of the Company indicating in a conference call, press releases and SEC filings that the ARC-520 Phase 2a study was producing extremely positive results eight weeks into the study, was by necessity false and misleading since it was only about midway through the study period since the study results were released 57 days later on October 8, 2014. Because of their above detailed education, experience, and the centrality of the outcome of the Phase 2a study of drug candidate ARC-520 to the future prospects of the Company, it is more likely than not that Drs. Anzalone, Given and Perry were participated in and/or were fully aware of the false and misleading nature of the statements detailed herein.  As such, Drs. Anzalone, B. Given and Perry face a sufficiently substantial likelihood of liability in the present claim as to render them non-impartial to consider demand.

55. Defendant Dr. Perry, as a member of the Audit, Compensation and Nomination Committees, was particularly aware of the fact that the core prospects of the Company were reliant upon public perception of the progress being made in the clinical testing of primary drug candidate ARC-520 and allowed the above detailed false and misleading statements to be made in connection therewith and/or failed to require a correction of such statements in a timely manner.

56. Defendant Frykman with his extensive experience in the field of public company oversight was particularly aware of the fact that the core prospects of the Company were reliant upon public perception of the progress being made in the clinical testing of primary drug candidate ARC-520 and allowed the above detailed false and misleading statements to be made in connection therewith and/or failed to require a correction of such statements in a timely manner.

57. All of the Director Defendants knowingly breached their fiduciary duty of due care and diligence to the Company.  The Director Defendants understood an assessment only midway through the studying period, particularly given without any specific numeric results to back it up, was highly suspect, and inherently misleading and false.  Their failure to take necessary and appropriate steps to respond to, correct and stop these false and misleading statements concerning ARC-520 constituted a knowing breach of their fiduciary duty.

58. In so doing, the Director-Defendants exposed the Company to severe damage and injury.  Consequently, the Director-Defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore excused.

## COUNT I

## BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY.

59.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

60.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Arrowhead business and affairs, particularly with respect to issues so fundamental as compliance with laws and regulation and regulatory body and shareholder reporting.

61.    Defendants' conduct set forth herein was due to their knowing breach of the fiduciary duties and the duty of loyalty they owed to the Company.  Defendants were aware of and participated in Arrowhead's failure to disclose material information

and making of false and misleading statements to the SEC, investors, and the general public.  In this fashion, Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Arrowhead.

62. As a direct and proximate result of defendants' breaches of their fiduciary obligations, Arrowhead has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT II**

**BREACH OF FIDUCIARY DUTY AND DUTY OF CARE**

63.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

64.    Each defendant owes and owed to the Company the duty to exercise due care and diligence to the Company.  Defendants breached their duty of care by failure to reasonably investigate under the circumstances.

65.    Defendants needed to make a sound and reasonable judgment regarding the studying of ARC-520.  Individual Defendants were grossly negligent because they failed to adequately monitor the progress of its primary drug during Phase IIa of the studying process.  Since ARC-520 is the Company's lead drug, more attention and care should have been taken to monitor the progress of this drug.  Given that ARC-520 was expected to serve as a functional cure for a deadly virus, providing less than ordinary and reasonable care.  Furthermore, since Individual Defendants are supposedly experts in the area of biopharmaceuticals, there duty of care was breached for not taking the reasonable precautions during the Phase IIa of studying, which was the first stage in which humans were studied.

66.    Individual Defendants did not act in the best interest of the Company when it failed to provide accurate information to the general public.

67. As a direct and proximate result of defendants' breaches of their fiduciary obligations, Arrowhead has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company..

## COUNT III

## ABUSE OF CONTROL.

68.     Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

69.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Arrowhead, for which they are legally responsible.

70.     As a direct and proximate result of defendants' abuse of control, Arrowhead has sustained significant damages. In particular, Defendants abused their positions of authority by causing or allowing Arrowhead to misrepresent material facts regarding its study progress of ARC-520..

71.     As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Arrowhead has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

72. As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, Arrowhead has sustained damages.

## PRAYER FOR RELIEF

FOR THESE REASONS, plaintiff demands judgment in the Company's favor against all defendants as follows:

A. Declaring that plaintiff may maintain this action on behalf of Arrowhead and that plaintiff is a adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Arrowhead;

C. Determining and awarding to Arrowhead the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D. Directing Arrowhead and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal

procedures, including, but not limited to the appointment of an independent panel of three outside directors to investigate and report upon the above described payments and to issue a report thereon with recommendations for revised compensation procedures and standards to prevent such payments in the future;

E. Determining and awarding to Arrowhead exemplary damages in an amount necessary to punish the defendants and to make an example of defendants to the community according to proof at trial;

F. Awarding Arrowhead restitution from each of the defendants;

G. Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:     December 2, 2014               REICH RADCLIFFE & KUTTLER LLP


                                          By: /s/ Adam T. Hoover
                                          Marc G. Reich
                                          Adam T. Hoover
                                          Attorneys for Plaintiff
                                          DAVID A. BERNSTEIN

## VERIFICATION

I, _David A. Bernstein_ , hereby declare as follows: _of Arrowhead Research Corp._

    I am a shareholder of _1,530 shares_ and have continuously so owned the Company's common stock during the relevant period. I have reviewed the foregoing Shareholder Derivative Complaint For Breach Of Fiduciary Duty And Abuse Of Control ("Complaint"), and authorize its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information or belief.

    I declare under penalty of perjury pursuant to the laws of this jurisdiction that the foregoing is true and correct and that this verification was executed at _Kent_ County, in the State of _Michigan_

_November 10,_ 2014

_David A. Bernstein_